IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ROBERT A. SCANDLON, JR., On behalf of Himself and All Others Similarly Situated,

                    Plaintiff,

    v.

BLUE COAT SYSTEMS, INC., BRIAN M. NESMITH and GORDON C. BROOKS,

                    Defendants.

_____/

No. C 11-4293 RS

**ORDER GRANTING MOTION TO DISMISS WITHOUT LEAVE TO AMEND**

## I. INTRODUCTION

This shareholders' putative class action arises from a steep decline in the share price of Blue Coat Systems, Inc. in May of 2010, the day after the company released financial results and provided forward-looking guidance that was less optimistic than had been anticipated. The complaint was previously dismissed for failure to plead with adequate specificity the supposed misrepresentations on which the claims were based, or facts showing scienter and loss causation. The Second Amended Complaint ("SAC")[1] relies on virtually the same set of factual allegations as

---

[1] Plaintiffs amended once as of right. The subject of the prior motion to dismiss was the First Amended Complaint.

to what the alleged misrepresentations were, and why scienter purportedly may be inferred. The only substantial change is that the class period has been extended to August of 2010, when the company made a further public announcement and the stock price experienced a further, although more modest, decline.

The amendments fail to cure the inadequacies. As before, (1) it is unclear what, if any, arguably actionable misrepresentations were made, (2) there is insufficient basis to infer scienter, and, (3) the alleged facts do not support loss causation. The motion to dismiss will be granted. Because there is no indication further amendment would be fruitful, leave to amend will not be granted.

## II. BACKGROUND

As in the prior pleading, the SAC contends that Blue Coat and two of its executives ("the Insider Defendants") are liable for fraud under §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder. Plaintiff[2] also seeks to hold the Insider Defendants responsible under §20(a) of the Exchange Act, as "controlling persons," who have derivative liability for any underlying violations of §10(b) by Blue Coat. The Insider Defendants are (1) Blue Coat's President and Chief Executive Officer, Brian M. NeSmith, and ; (2) its Chief Financial Officer Principal Accounting Officer and Senior Vice President, Gordon C. Brooks. NeSmith is alleged to have sold stock during the class period; Brooks is not.

As plaintiff continues to characterize it, this is a case where Blue Coat and certain insiders "knowingly misled investors and securities analysts by painting a falsely optimistic picture of Blue Coat's health, prospects, growth, and the extent of its actual sales." Plaintiff again alleges that during the class period, "the Company's CEO took the opportunity to unload 20% of his Blue Coat shares – for proceeds of nearly $5 million."

---

[2] Although Robert A. Scandlon, Jr. is still shown as the plaintiff in the caption of the SAC, the only plaintiff is Inter-Local Pension Fund of the Graphic Communications Conference of the International Brotherhood of Teamsters, which allegedly "purchased the common stock of Blue Coat during the Class Period and has been damaged thereby."

2

In the prior complaint, the alleged class period ran from November 24, 2009 to May 27, 2010. On the last day of that period, Blue Coat released financial results and held a conference call with analysts. When the market opened the following day, Blue Coat shares lost over a quarter of their value, "plunging" $7.37 per share, down to $21.47 on trading volume 16 times the average volume for the Class Period. Plaintiff now contends the May 27th financial reports and conference call statements made by the company were only a "partial disclosure" that prior statements had been overly optimistic. While Blue Coat met its financial projections, and did not otherwise directly admit or imply that any of its prior representations had been incorrect, plaintiff contends the May 27th disclosures "revealed facts that indicate [defendants'] prior statements about Blue Coat's strength in the EMEA market [Europe, Middle East and Africa] and their stated expectations for continued revenue growth in [that] market had been untrue."

As noted, the primary change reflected in the SAC is an extension of the class period, which plaintiff now proposes to run until August 19, 2010. On that date, Blue Coat announced its financial results for 1Q 2011, ended on July 31, 2010 and held a conference call with analysts and investors. In the call Blue Coat stated, among other things, the following:

> We continue to believe that one factor affecting the business is macroeconomic uncertainty which is being driven by some currency headwinds and sub-regional weakness in the U.K. and Southern Europe. At the same time, <u>we now have concluded that the main reasons for our challenges in EMEA are related to poor sales execution and the over-reliance on the two-tier distribution model</u> by our sales organization there . . . .
>
> Although there are economic challenges in Europe, over the course of the last quarter, it became clear that <u>much of our weakness was specific to Blue Coat and specifically our EMEA sales organization</u> . . . .
>
> What became clear in Q1 is that our European team was too slow in implementing this sales model . . . .
>
> In addition, our team in Europe remained primarily focused on selling our security products and was slow to start aggressively promoting our acceleration products, including both PacketShaper and our WAN optimization solutions.

Plaintiff contends this disclosure that results had been impacted by conditions within Blue Coat, as opposed merely to general economic conditions, demonstrates that prior optimistic statements had been false when made. After the announcement and conference call, Blue Coat's stock price dropped $1.45 per share – from $18.95 down to $17.50 – a decline of approximately 8% on volume of 2.5 million shares.

### III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations are not required," a complaint must include sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 US 544, 570 (2007)). A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Claims grounded in fraud are also subject to Rule 9(b), which provides that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy that rule, a plaintiff must allege the "who, what, where, when, and how" of the charged misconduct. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997).

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may be based either on the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party. *Twombly*, 550 US at 570). "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996); *see also Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 US at 555 ("threadbare recitals of the elements of the cause of action, supported by mere conclusory statements," are not taken as true). In actions governed by the Private Securities Litigation Reform

Act ("PSLRA"), such as this one, these general standards are subject to further refinement, as discussed in more detail below.

IV. DISCUSSION

A. <u>Count I—Section 10(b) of the Exchange Act</u>

Section 10(b) of the Exchange Act makes it unlawful for "any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Pursuant to Section 10(b), the Securities and Exchange Commission ("SEC") has promulgated Rule 10b-5, which provides, *inter alia*, "It shall be unlawful for any person ... [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(c).

To establish a violation of Rule 10b-5, a plaintiff must demonstrate "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Daou Systems, Inc. Securities Litigation*, 411 F.3d 1006, 1014 (9th Cir. 2005). To survive a motion to dismiss, a complaint asserting claims under section 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of Rule 9(b) and the PSLRA. *Zucco Partners v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

*1. Falsity*

Plaintiff has made no significant changes to any of the allegation presented as examples of misrepresentations. As before, the allegedly "false" statements on which plaintiff bases its claims are a hodgepodge of generally positive statements Blue Coat was making about the then-existing state of its business, with some implications that continued or increased future success could be

expected. It remains obscure exactly what plaintiff contends constitute the actual misrepresentations. Plaintiff has not meaningfully addressed, let alone cured, the problems identified in the prior order that (1) it had not sufficiently identified what representations allegedly were false and why, (2) why a substantial portion of the statements quoted in the complaint as containing misrepresentations are not best characterized as "puffery" or other non-specific assertions otherwise inadequate as a basis for a fraud claim, and (3) how mere possession of some negative information requires a company to refrain from forming and expressing opinions reflecting a "rosy" prognosis without disclosing every detail that informs those overall opinions. Even if some of the assessments turn out to have been wrong, a failure by the company to have disclosed *every* potentially negative detail does not render the positive assessments as fraudulent.

### 2. *Scienter*

The PSLRA expressly provides that to plead scienter, a complaint must, "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), the Supreme Court defined "strong inference," such that a securities fraud complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter *cogent and at least as compelling as* any opposing inference one could draw from the facts alleged." 127 S.Ct. at 2510 (emphasis added). Absent a sufficient pleading of material misstatements or omissions, there of course can be no adequate pleading of scienter.

As explained in the prior order, however, even assuming plaintiff had pleaded cognizable misrepresentations, the nature of its basic theory presents a particular challenge for inferring scienter. In essence, plaintiff was, and still is, alleging that Blue Coat made bad business judgments and poorly executed its changes in strategy after the Packeteer acquisition. While plaintiff argues that Blue Coat management had become aware of such shortcomings by the time it was making the generally positive public statements at issue, an equally plausible inference is that to the extent any statements were unduly positive, that was merely another aspect of management's failure to understand and respond well to business conditions. The new material in the SAC regarding the

August 2010 disclosures does not change that balance in the slightest. Plaintiff's strenuous assertions notwithstanding, the August 2010 was in no way, shape, or form, an "admission" that prior statements had been knowingly false or misleading. To be sure, the company was admitting that *by August of 2010*, it had come to recognize its financial results were being negatively affected by operational issues, not just the economy. Nothing in the company's "disclosures", however, or in anything else plaintiff has pleaded, indicates the company necessarily knew or should have understood those conditions existed when earlier, more positive, statements were being made.[3]

*Tellabs* instructs that the Court must determine whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." 127 S.Ct. at 2509. The evaluation requires the Court to take into account plausible opposing inferences." *Id.* Notably, this "inquiry is inherently comparative." *Id*. at 2510. As explained in *Zucco*, "[a] court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." 552 F.3d at 991. As before, even to the extent anything in the SAC could be seen as an adequate allegation of a material misrepresentation or omission, plaintiff has not pleaded facts to support a compelling inference that any such misrepresentations or omissions were the result of an intent to deceive, as opposed to a failure to analyze business conditions correctly.[4]

---

[3] The allegations regarding Confidential Witnesses are unchanged. As before, the witnesses' generalized reports of various issues within the company at certain points in time are insufficient to show that any positive statements were false when made.

[4] Plaintiff continues to rely on stock sales during the class period by NeSmith as indicative of scienter. As *Zucco* held, "[f]or individual defendants' stock sales to raise an inference of scienter, plaintiffs must provide a 'meaningful trading history' for purposes of comparison to the stock sales within the class period." 552 F.3d at 1005. Despite the flagging of this issue in the prior order, the stock sale allegations are virtually unchanged.

### 3. Loss Causation

"Loss causation" refers to a plaintiff's obligation in a securities fraud action to establish "a causal connection between the material misrepresentation and the loss." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005). The loss causation requirement was codified in the Private Securities Litigation Reform Act:

> In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

15 U.S.C. § 78u-4(b)(4) (emphasis added).

Here, plaintiff continues to have a fundamental problem arising from the fact that nothing in either the May or August statements of the company amounts to a "corrective disclosure." Although liability under Rule 10b-5 does not necessarily require a company to admit wrongdoing, at least in a "fraud on the market" case like this, a plaintiff typically must make some showing that the drop in stock price reflects investors becoming aware prior representations were false or misleading. *See McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425–26 (3rd Cir. 2007) ("[T]o satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff.")

While plaintiff has conclusorily asserted that the stock price fell because investors belatedly "learned the truth," the facts pleaded show no such connection. In May the company announced it had met all of its projections, but that the future would not continue to be as successful. In August the company again announced it had met its projections, and explained its then-current view that operational mistakes had impacted sales. Nothing in these circumstances supports an inference that the stock price fell, in either May or August as a result of previously-concealed truths coming to light.[5] Although other methods of establishing loss causation may be available in some instances, plaintiff has not articulated any such viable theory here.

---

[5] The SAC continues to include some conclusory and non-specific allegations regarding possible "channel stuffing" or other improper revenue recognition practices. Even if those averments were

### B. Count II—Section 20(a) of the Exchange Act

Section 20(a) of the Exchange Act makes certain "controlling" individuals also liable for violations of Section 10(b) and its underlying regulations. Specifically, section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

There is no dispute that any liability under Section 20(a) in this action is dependent on the existence of an underlying violation of Section 10(b). In view of the dismissal of the 10(b) claims, this count must also be dismissed.

### V. CONCLUSION

The motion to dismiss is granted. A separate judgment will enter.

IT IS SO ORDERED.

Dated: 9/20/13

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

---

sufficiently detailed, there is no allegation that the drops in stock price in either May or August were the result of the market becoming aware of any such practices.